# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

          Plaintiff/Respondent,

v.                                            CV 07-0513 JP/WPL
                                            CR 02-2072 JP

ANDREW BEGAYE,

          Defendant/Movant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

This matter is before me on Andrew Begaye's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a person in federal custody. (Doc. 178.)[1] Begaye was convicted of distribution of methamphetamine and conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 841(b)(1)(C) and § 846, and three counts of firearm possession or use in violation of 18 U.S.C. § 922(g)(1) and § 924(c)(1)(A).

### PROCEDURAL AND FACTUAL BACKGROUND

### Procedural Background

The government indicted Begaye on the following eight counts. (Doc. 149.) Counts I, III, and IV of the indictment charged Begaye with distribution of, and conspiracy to distribute, methamphetamine in violation of 21 U.S.C. § 841 and § 846, both arising out of incidents that occurred in June and July of 2002. Count II of the indictment charged Begaye with the use of a firearm in relation to a drug trafficking offense, also arising out of an event in June of 2002, in violation of 18 U.S.C. § 924(c)(1)(A). Counts V and VII of the indictment charged Begaye with

---

[1] All document number references are to CR No. 02-2072.

being a felon in possession of a firearm in violation of 18 U.S.C. § 922. Lastly, Counts VI and VIII of the indictment charged Begaye with intent to distribute methamphetamine in violation of 21 U.S.C. § 841 and the use of a firearm in furtherance of this drug trafficking crime in violation of 18 U.S.C. § 924(c). Both Counts VI and VIII arose out of incidents that occurred in June 2003. Following trial, a jury found Begaye guilty on Counts I through V and VII and not guilty on counts VI and VIII.

Following his conviction, Begaye appealed. On appeal, Begaye argued that "the district court 1) failed to make specific findings to justify enhancing his sentence for an aggravating role in the offense; 2) violated his *Fifth Amendment* rights by imposing the obstruction-of-justice enhancement; and 3) violated his *Sixth Amendment* rights pursuant to [*United States v. Booker*, 543 U.S. 220 (2005)], by basing his sentence on judge-found facts." *United States v. Begaye*, 163 F. App'x 669, 670 (10th Cir. 2006). The Tenth Circuit rejected Begaye's arguments and affirmed his conviction.

## Evidence Presented at Trial

### *Events of June 2002*

Count II of the indictment charging Begaye with possession of a firearm in furtherance of a drug trafficking offense arose out of an alleged drug transaction between Begaye, Stephanie Pergeson, and Royce Littlefield, Pergeson's cousin, in June of 2002. According to Pergeson, she first met Begaye in the middle of June of 2002 at the home of Clarence Hahn. (Tr. 213:20-214:2.) Roughly a week after meeting Begaye, Pergeson testified that she was "looking for Clarence Hahn at Chris Pena's house and Andrew Begaye pulled up" in his car and gave her his number. (Tr. 214:6-11.) The next day, Pergeson called Begaye in the hope of trading two guns owned by Littlefield with Begaye in exchange for drugs. (Tr. 214:10-215:1.) According to Pergeson, she and Littlefield

ultimately exchanged the two guns for roughly 3.4 grams of methamphetamine. (Tr. 217:24, 218:23-219:17.)

At trial, both Begaye and his wife disputed Pergeson's and Hahn's version of this transaction. According to Ms. Begaye, Hahn first showed the two rifles to Begaye. (Tr. 497:6-248:17.) Mrs. Begaye testified at trial that she purchased the rifles from Hahn on May 25, 2002 for her husband as a birthday gift. (Tr. 495:4-5, 496:13-15.) Ms. Begaye testified that when Hahn brought the rifles to Begaye's house for Begaye to look at, Begaye was "extremely interested in them." (Tr. 495:9-21.) Ms. Begaye recalled that at the time one rifle was functional and one was not functional. (Tr. 495:12-13.)

### Events of July 2002

In June of 2002, officials from the Drug Enforcement Agency began investigating drug-related offenses in and around Portales, New Mexico. On July 10, 2002, Agent Ogden and Agent Stevens, both members of the DEA task force in Portales, met Stephanie Pergeson.[2] (Tr. 21:9-11.) The meeting took place at an address on North Globe at sometime between 9:00 and 9:30 in the evening. (Tr. 21:18, 22:7.) Ogden, acting undercover, arranged to buy a quarter of an ounce of methamphetamine from Pergeson. (Tr. 21:14-15.) Pergeson told Ogden to follow her to another location. (Tr. 21:21-24.) Ogden did so and followed Pergeson from North Globe to the corner of North Elb and Globe. (Tr. 22:16-17.)

After arriving at the corner of North Elb and Globe, Pergeson instructed Ogden to wait while she retrieved the methamphetamine. (Tr. 22:14-24.) Agent Ogden watched as Pergeson and her

---

[2] Ogden testified at trial that during the transactions on July 10 and 11 he did not know Pergeson's real name but knew of her only by the name "Crazy." (Tr. 28:8.)

mother walked down the street, up an alleyway, and out of sight. (Tr. 22:14-24.) Pergeson returned, alone, a few minutes later and told Ogden to pay before he could have the methamphetamine. (Tr. 22:25-23:4.) Ogden refused. (Tr. 23:1-4.)

Upon Ogden's refusal, Pergeson instructed Ogden to follow her to another location. (Tr. 23:24-25.) Ogden did so and, following Pergeson's instructions, drove up the alleyway and parked approximately 20 to 30 feet behind a trailer home. (Tr. 24:3-5, 13-14.) Pergeson entered the trailer home and emerged a short time later with two men. (Tr. 25:6-11.) The two men sat in lawn chairs by the trailer's front door. (Tr. 25:9-11.) After discussing payment for several minutes, Agent Stevens, Ogden's partner, gave Pergeson $200. (Tr.24:25-25:1.) Pergeson returned to the trailer and spoke with one of the individuals sitting in a lawn chair. (Tr. 25:12-19.) At trial, Ogden identified Begaye as one of the men sitting in the lawn chairs. (Tr. 26:14-23.) Pergeson then returned to Ogden's vehicle and gave Stevens a clear plastic bag containing methamphetamine. (Tr. 25:17-22.) After this, Ogden watched the individual who had just given Pergeson something from his pocket stand and walk to a vehicle parked directly in front of Ogden, retrieve something, then return to the house. (Tr. 27:4-12.) At this point, Pergeson told the agents that her supplier was going to weigh the remaining methamphetamine. (Tr. 27:10-12.) Pergeson left the agents and returned to the trailer home. (Tr. 27:18-20.) Pergeson remained in the house for a short time and then returned with another plastic bag containing the remaining methamphetamine. (Tr. 27:18-22.) Before leaving, Pergeson left her number with Ogden. (Tr. 28:3-5.)

The following day, July 11, 2002, Ogden again contacted Pergeson to purchase an ounce of methamphetamine. (Tr. 31:13-22.) Ogden and Pergeson arranged for the transaction to occur later that evening at the trailer home on North Fargo, the same location as the previous evening's

4

transaction. (Tr. 31:25-32:2.) At approximately 9:00 that evening, Ogden, now accompanied by Agent Lillian Valles, posing undercover as Ogden's girlfriend, arrived at the trailer home on North Fargo. (Tr. 32:5-10; 35:15-19.) Ogden parked behind the trailer home and called Pergeson. (Tr. 32:16-17.) Pergeson exited the trailer, and, expressing concern, asked Ogden to leave and wait at a nearby store. (Tr. 32:21-24.) Ogden refused to go elsewhere but agreed to move along the alleyway farther from the trailer home. (Tr. 32:24-33:13.) Ogden parked his car, exited, and walked back to discuss with Pergeson the purchase of the methamphetamine. (Tr. 33:14-16.) Ogden gave Pergeson $720. (Tr. 33:21-23.) Pergeson then returned to the trailer. (Tr. 33:25.)

At this point, Clarence Hahn, an individual present on the previous evening, left the trailer on a bicycle and followed the gravel road leading back to the corner of North Elb. (Tr. 34:1-5.) According to Hahn, he rode his bike to a nearby Sonic Restaurant where he gave Begaye the agents' money in return for the methamphetamine. (Tr. 122:10-19, 123:12-18.) Hahn returned to the trailer approximately 45 minutes later. (Tr. 35:23-25.) Shortly after Hahn's return, a driver in a white Grand Marquis approached the agents. (Tr. 36:8-14.) The car pulled along the passenger side of the agents' car. (Tr. 36:13-16.) Ogden, seated in the driver's seat, recognized the driver as the same individual who, the evening before, had handed Pergeson something out of his pocket. (Tr. 36:19-23.) At this point, the individual in the white car asked if the agents were waiting for Clarence. (Tr. 37:2-5.) Ogden replied "No, we're waiting on Crazy." (Tr. 37:2-3.) The individual then said "I wrapped that stuff tight, be careful, I wrapped it tight, she's known to take some." (Tr. 37:3-5.) The driver of the white car then drove away. (Tr. 37:11-12.) Approximately two to five minutes later, Pergeson arrived with an untied plastic bag containing methamphetamine. (Tr. 27:18-21.) The bag contained only 18

grams of methamphetamine, roughly 10 grams less than an ounce. (Tr. 37:23-38:25.) Following the transaction, the agents left the area. (Tr. 39:2-3.)

### November 26, 2002 Search of Begaye's Home

On November 21, 2002, agents with the DEA and several local law enforcement agencies executed an arrest warrant for Begaye. (Tr. 257:8-25.) During the execution of the arrest warrant, the agents discovered a number of firearms in Begaye's home. (Tr. 266:9-15.) The agents arrested Begaye but did not seize any of the firearms discovered in the house. (Tr. 268:14-269:10.)

On November 26, 2002, agents from federal and state authorities executed a search warrant on Begaye's house to locate and seize the firearms discovered in his house during execution of the prior arrest warrant. (Tr. 287:12-25.)

### Events of June 2003

In April or May of 2003, Begaye hired Michael Cox "to work on a patio" and to work around Begaye's house.[3] (Tr. 563:15-20.) On May 25, 2003, Begaye fired Cox. (Tr. 564:1-3.) According to Begaye, the disappearance of several tools, and Cox's wife's frequent and distracting visits to the Begaye house, precipitated Cox's termination. (Tr. 564:5-24.) Subsequently, in June of 2003, Cox contacted Preston Wilkerson, a detective with the Portales Police Department. (Tr. 368:5-24.) Cox told Wilkerson that Wilkerson could find methamphetamine in three locations in Begaye's house. (Tr. 368:20-24.)

According to Wilkerson's testimony, Wilkerson, using Cox as an informant, purchased methamphetamine from Begaye on three occasions. (Tr. 376:19-23, 379:5-7, 381:13-14.) Wilkerson

---

[3] Cox is Stephanie Pergeson's uncle. (Tr. 368:18-23.)

testified that on June 2, 2003, he and Cox drove to Begaye's house and, after speaking with Ms. Begaye, learned that Begaye was not home. (Tr. 376:19-377:9.) The two men then drove to a local bar, where they found Begaye's vehicle. (Tr. 377:8-9.) Mr. Cox entered, found Begaye, and appears to have had a conversation with him. (Tr. 377:23-378:3.) Wilkerson and Cox then returned to Begaye's house and waited for him. (Tr. 378:1-3.) While waiting, Cox spoke with Ms. Begaye. (Tr. 378:1-2.) Upon Begaye's return, Cox and Begaye entered the garage. (Tr. 378:2-3.) After Cox left Begaye's garage, he and Wilkerson left Begaye's house and drove to another location, where Cox gave Wilkerson a package of methamphetamine. (Tr. 378:15-19.)

On June 10, 2003, Wilkerson again arranged to purchase another package of methamphetamine from Begaye. (Tr. 379:5-7.) On this occasion, Wilkerson followed Cox to Begaye's residence, where Cox entered Begaye's house with $60 and returned to Wilkerson with a package of methamphetamine. (Tr. 379:20-380:23.) Again, on June 19, 2003, Wilkerson gave Cox another $60. (Tr. 381:13-14.) Cox went to speak with Begaye and returned to Wilkerson with a package of 1 gram of methamphetamine. (Tr. 382:1-13.)

On June 20, 2003, the Portales Police Department executed a warrant on Begaye's home. (Tr. 334:16-24.) During the search, officers with the department found methamphetamine in the house. (Tr. 352:23-24, 353:21-25.) The officers also found firearms in Begaye's home. (Tr. 336:18-338:7.) The jury acquitted Begaye of the two counts arising out of the incidents that occurred in June of 2003.

## TESTIMONY PRESENTED AT THE EVIDENTIARY HEARING

Four individuals testified at the evidentiary hearing held on May 21, 2008.

**The Government's Presentation of Witnesses**

As its only witness, the government called James Klipstine, Begaye's attorney during his criminal trial. Klipstine testified that Begaye retained him in May of 2003. According to Klipstine, Begaye recalled his activities on July 10, 2002 but could not recall his activities on July 11, 2002. Before trial, Klipstine learned from Begaye that on July 10, 2002, Begaye and his wife were in Clovis shopping for a car. After leaving Clovis, Begaye and his wife returned to Portales and met some friends at a Pizza Hut. According to Klipstine, his notes from an initial interview with Begaye reflect that Begaye told him that he and his wife remained at the Pizza Hut for one to one and a half hours, or until 9:00 p.m. or 9:30 p.m. Klipstine testified that Begaye gave him the names of other individuals at the Pizza Hut on July 10, 2002.

Klipstine testified that the police reports from July 10, 2002 indicated that the drug transaction on that date occurred between 10:00 and 10:30 in the evening. In light of these reports, Klipstine did not consider the individuals who accompanied Begaye and his wife at the Pizza Hut as alibi witnesses. Klipstine, therefore, did not contact the individuals who joined Begaye at the Pizza Hut on July 10, 2002.

**Begaye's Presentation of Witnesses**

Begaye presented three witnesses at the evidentiary hearing. Begaye's first witness, Teresa Dyer, testified that she and her husband joined Begaye and his wife at the Pizza Hut in Portales, New Mexico, on July 10, 2002, to celebrate the Begayes' wedding anniversary. According to Ms. Dyer, she and her husband arrived at the Pizza Hut around 6:30 or 7:30 and remained at the restaurant until after dark. Ms. Dyer estimated that she, her husband, and the Begayes left the Pizza Hut after 9:00 in the evening. Additionally, Ms. Dyer testified that Begaye remained at the restaurant for the entire

evening except for a five-minute period of time when he stepped outside with Ms. Dyer's husband, Ron Dyer, and another man, whose name Ms. Dyer did not know.

I consider Ms. Dyer to be a credible witness. Ms. Dyer has not spoken with Begaye for five years. She and her husband severed contact with Begaye and his wife shortly after Begaye's arrest in November of 2002. In light of these facts, and in light of Ms. Dyer's demeanor while testifying, I find Ms. Dyer's testimony to be credible.

As his second witness, Begaye elicited testimony from Ron Dyer. Mr. Dyer testified that he met Ms. Begaye while he was serving as a teacher at a school in Portales. Mr. Dyer recalled that on the evening of July 10, 2002, he and his wife met the Begayes at Pizza Hut around 6:30 in the evening and remained at the restaurant until dark. Mr. Dyer estimated that they were at the Pizza Hut until sometime between 9:00 and 9:30. According to Mr. Dyer, during the meal he and Begaye left the restaurant for roughly five minutes and "visit[ed]" with an individual named John who drove a pickup truck. Mr. Dyer also testified that he and his wife stopped spending time with the Begayes after Begaye's arrest in November of 2002.

As with his wife's testimony, Mr. Dyer's testimony at the evidentiary hearing was credible. Mr. Dyer readily admitted that he and his wife discussed the events of July 10, 2002 when they received notice that they would be called to testify. But neither Mr. Dyer's nor his wife's testimony appeared practiced or rehearsed. For these reasons, and based on Mr. Dyer's demeanor while testifying, I find Mr. Dyer to be a credible witness.

Following testimony from Teresa and Ron Dyer, Begaye testified on his own behalf. Begaye testified that he spoke with Klipstine about his dinner with the Dyers on July 10, 2002 and their potential role as alibi witnesses. According to Begaye, Klipstine mentioned an investigator whom

Klipstine indicated would speak with the Dyers about their dinner with Begaye on July 10, 2002. Begaye testified that at some point prior to trial, Klipstine said that he would need an additional $2,000 for the four alibi witnesses to be brought to trial. According to Begaye, on the day of trial, he asked Klipstine where the witnesses were and Klipstine informed him that no money had been provided to cover the cost of calling the witnesses.

**STANDARD OF REVIEW**

A petition under 28 U.S.C. § 2255 attacks the legality of a federal prisoner's detention. *Bradshaw v. Story*, 86 F.3d 164, 166 (10th Cir. 1996). Under § 2255, a federal prisoner "may move the court which imposed the sentence to vacate, set aside or correct the sentence" if "the sentence was imposed in violation of the Constitution or laws of the United States, or [] the court was without jurisdiction to impose such sentence, or [] the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack . . . ."  28 U.S.C. § 2255 (2006).

"Section 2255 motions are not available to test the legality of matters which should have been raised on direct appeal." *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994). "[F]ailure to present an issue on direct appeal bars" a petitioner "from raising that issue in his § 2255 motion, unless he can show cause excusing his procedural default and actual prejudice resulting from the errors of which he complains, or can show that a fundamental miscarriage of justice will occur if his claim is not addressed." *Id.*  This bar does not apply, however, to ineffective assistance of counsel claims.  *United States v. Mora*, 293 F.3d 1213, 1216 (10th Cir. 2002). A petitioner may not bring a claim under § 2255 that was considered and disposed of on direct appeal. *Warner*, 23 F.3d at 291.

10

DISCUSSION

In his *pro se* Motion, Begaye advances an ineffective assistance of counsel claim. Begaye relies on two arguments to support this claim. First, Begaye argues that trial counsel was constitutionally ineffective due to a "monetary conflict of interest in failing to provide" an alibi defense at trial. (Doc. 178 at 4.) Second, Begaye contends that his trial counsel was constitutionally ineffective for failing to investigate Begaye's alibi defense and failing to present an alibi defense. (Doc. 178 at 9.) Because Begaye's two arguments arise out of counsel's alleged failure to call alibi witnesses, I will, for purposes of this analysis, treat these two separate arguments as one.

At the evidentiary hearing, Begaye's appointed counsel raised additional issues regarding Klipstine's representation.  He also raised these issues in Petitioner's Proposed Findings of Fact and Conclusions of Law, filed after the hearing.  Counsel argues that Klipstine was ineffective in failing to challenge the identification of Begaye by one witness; failing to visit the trailer where the transactions occurred on July 10-11, 2002; failing to appear for Begaye's arraignment; failing to file any pretrial motions other than motions for continuances; failing to object to the government's notice of 404(b) evidence; failing to object to expert testimony; failing to file a witness or exhibit list; and failing to file any proposed jury instructions, including instructions on alibi and identification. Counsel also faults Klipstine for failing to present evidence that Begaye was out of town when some of the offenses occurred, as well as evidence that Begaye did not own a white Lincoln until August 2002. Begaye testified at the evidentiary hearing that he and his wife had this evidence at the time of trial, but Klipstine did not request it from them.[4]

---

[4] These new claims may be time-barred.  *See* 28 U.S.C. § 2255(f)(1); *see also United States v. Espinoza-Saenz*, 235 F.3d 501, 505 (10th Cir. 2000) (explaining when a new claim will relate back under FED. R. CIV. P. 15(c) in a § 2255 proceeding).  The government has not raised the time bar as a defense and

11

## Standard for Ineffective Assistance of Counsel

To establish ineffective assistance of counsel, a habeas petitioner must satisfy a two-part test. The petitioner must show both that counsel's performance was deficient and that the deficient performance prejudiced the petitioner's defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To demonstrate deficient performance, a petitioner must show that counsel's performance fell below an objective standard of reasonableness. *Id.* at 688. Because judicial scrutiny of counsel's performance is highly deferential, the petitioner must overcome the presumption that the challenged action might be considered sound trial strategy. *Id.* at 689. To establish that counsel's deficient performance prejudiced the petitioner's defense, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "This court may address the performance and prejudice components in any order, but need not address both if [the Petitioner] fails to make a sufficient showing of one." *Foster v. Ward*, 182 F.3d 1177, 1184 (10th Cir. 1999).

### *Alibi*

The Tenth Circuit has observed that there is no "per se rule" governing "the prejudicial effect of alibi testimony that could have been, but was not presented at trial." *Id.* at 1185 n.1. Because prejudice arising out of failure to present alibi witnesses involves a case-by-case examination, I will

---

has not objected to consideration of the new claims. Accordingly, I will consider the merits of the claims. *Cf. Day v. McDonough*, 547 U.S. 198, 209-10 (2006) (holding, in a § 2254 case, that a district court is permitted but not required to raise a limitations issue *sua sponte*, after considering the interests of justice and giving the parties an opportunity to present their positions on the issue).

first address whether or not James Klipstine's failure to investigate and call the alibi witnesses at trial prejudiced Begaye's defense.

As the petitioner in this habeas proceeding, Begaye carries the burden to show that there is a reasonable probability that, had his trial counsel interviewed and called the alibi witnesses, "the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. Analysis of Begaye's proposed alibi defense, along with the evidence presented by the government, discloses several flaws in Begaye's argument that there is a reasonable probability that the result of the proceedings would have been different had James Klipstine called the Dyers as witnesses at trial.

Begaye's habeas petition points to only four alibi witnesses who saw him at the Pizza Hut on the evening of July 10, 2002. Two of these witnesses, Teresa and Ron Dyer, testified at his evidentiary hearing. According to Teresa Dyer, she, her husband, her niece, and her niece's boyfriend joined the Begayes at the Portales Pizza Hut on the evening of July 10, 2002 at sometime between 6:30 and 7:30. Ms. Dyer testified that they remained with the Begayes at the Pizza Hut until after dark, which she estimated was sometime after 9:00. Ron Dyer similarly testified that he and his wife joined the Begayes at the Pizza Hut at around 6:30 and remained at the restaurant until dark. Mr. Dyer estimated that both the Dyers and the Begayes finally left the Pizza Hut parking lot sometime between 9:00 and 9:30 in the evening.

It is clear that the testimony of Ron and Teresa Dyer "casts some doubt on aspects of the [government's] case . . . ." *Lawrence v. Armontrout*, 31 F.3d 662, 668 (8th Cir. 1994). The Dyers' testimony, for example, would have weakened Clarence Hahn's testimony.  Both Ron and Teresa Dyer testified that they left the Pizza Hut after dark on the evening of July 10, 2002. They inferred from this that their departure occurred sometime between 9:00 and 9:30. Clarence Hahn, in contrast,

testified that on the evening of July 10, 2002, Begaye was at Hahn's house "about before sundown, [when] the sun was just going down [and] it wasn't dark yet." (Tr. 127:20; 154:19.) Testimony of both Teresa and Ron Dyer that Begaye left the Pizza Hut sometime after dark would obviously have weakened Hahn's testimony that Begaye was at Hahn's house "before sundown."

But while casting doubt on the testimony of Clarence Hahn, the Dyers' testimony posed no significant conflict with the testimony of the DEA agents present on the evening of July 10 and did not "actually rule out the possibility that [Begaye] committed the crimes as charged."[5] *Lawrence*, 31 F.3d at 668. Several DEA agents testified that they arrived at Hahn's house sometime between 9:00 and 9:30. Agent Valles, who was conducting surveillance on the evening of July 10, testified that Agents Ogden and Stevens "arrived at the location in Portales, 116 Globe" at around 9:30. (Tr. 77:16-18.) Ogden testified that they arrived at 116 Globe at approximately "9:00, 9:15." (Tr. 22:7.) These statements tend to establish that Ogden and Stevens met Pergeson sometime between 9:00 and 9:30 on the evening of July 10. From 116 Globe, the Agents followed Pergeson to a location at the corner of North Elb and Globe. (Tr. 22:17.) The Agents then followed Pergeson a short distance to Hahn's trailer home on North Fargo.

---

[5] This is not a case where the omission of alibi witnesses constituted a "speaking silence," thus leaving the jury free to conclude that defense counsel could not live up to the claims made during his opening statement. *See Harris v. Reed*, 894 F.2d 871, 879 (7th Cir. 1990) (finding prejudice where counsel's failure to produce witnesses to support alibi defense presented in opening argument likely led the jury to conclude that "counsel could not live up the [sic] claims made in the opening"). Here, Klipstine highlighted Begaye's alibi defense in his opening argument and supported this defense with the testimony of both Begaye and Begaye's wife. Such testimony established an alibi defense that the jury was able to weigh against the evidence presented by the government. *See Foster*, 182 F.3d at 1185 (concluding that "defense counsel's omission of alibi evidence does not undermine our confidence in the guilty verdict" where defense counsel presented the alibi defense through defendant's own testimony).

14

Even assuming that no significant time elapsed between the Agents' first encounter with Pergeson and their arrival at Hahn's trailer home, the Dyers' testimony does not rule out the possibility that Begaye left the Pizza Hut and made the short drive to North Fargo. As the government demonstrated at the evidentiary hearing, the driving distance between the Pizza Hut in Portales, and Clarence Hahn's trailer home at 1321 North Fargo Avenue in Portales, is approximately two minutes. (Plaintiff's Ex. 1.) The Dyers' testimony provides only an imprecise timeline for Begaye's activities on the evening of July 10. The Dyers recall the time of their departure from the Pizza Hut based solely on their recollection that it was dark when they left. Without a precise time of departure, it is impossible to rule out the possibility that Begaye arrived at Hahn's trailer shortly after his departure from the Pizza Hut. It is even possible that the Begayes and Dyers left the Pizza Hut before 9:00, a conclusion supported by Ron Dyer's testimony that the two couples arrived at the Pizza Hut at 6:30 p.m. and remained at the restaurant for two hours. Thus, nothing in the testimony of Ron or Teresa Dyer rules out the possibility that following his departure from the Pizza Hut Begaye drove the short distance between the Pizza Hut and Hahn's trailer home at North Fargo.

Moreover, "[i]n making a prejudice determination, the strength or weakness of the State's case is relevant." *Holmes v. McKune*, 59 F. App'x 239, 253 (10th Cir. 2003). A verdict that is "'only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" *Id.* (quoting *Strickland*, 466 U.S. at 696). Testimony from Ron and Teresa Dyer "might justify relief if the State's case was relatively weak." *Lawrence*, 31 F.3d at 668. But where, as here, the government's case is strong, the Dyers' testimony fails to provide new evidence sufficient to undermine confidence in the jury's verdict.

15

Relief is unavailable to a habeas petitioner where the proposed alibi witness fails to establish a reasonable probability that the result at trial would have been different. In *Lawrence*, for example, a case out of the Eighth Circuit, the court observed that a defendant's alibi evidence did not justify relief where the government presented substantial evidence of the defendant's guilt. *Lawrence*, 31 F.3d at 668. In *Lawrence*, the government presented testimony from "three different witnesses who identified [the defendant] as being at the scene of the crime on the evening in question." *Id.* One witness saw the defendant from a distance of only five feet. Another witness "memorized the license number of the car used in the crime, and stated that he had 'no doubt' about his identification of the car, later determined to be owned by [the defendant's mother]." *Id.* Based on this and other evidence introduced by the state, the Eighth Circuit concluded that there was no "reasonable probability that the result would have been different, and that [the defendant] would have been acquitted if his alibi witnesses testified at trial." *Id.*

Here, the evidence presented by the government provides substantial record support for the charges against Begaye involving the events on July 10 and 11. The government, for example, offered three witnesses, including Hahn, who identified Begaye as being at the scene of the drug transaction on July 10, 2002. First, Ogden provided testimony that he observed Begaye at Clarence Hahn's trailer home on July 10. Ogden testified, "There was a light that was located by the door of the trailer house, that light was on so it lit up the area all around the trailer house. And there was also a street light and -- adjacent to right where we were parked. So it was dark, but my eyesight and the visual area where the people were sitting was very good." (Tr. 26:2-7.) Ogden testified that he was 20 to 30 yards away from where the two men were sitting outside of Hahn's trailer. (Tr. 26:8-9.)

In addition to Ogden's account of the events of July 10, the government also presented Stephanie Pergeson's account of the events of July 10. Pergeson testified that Begaye was present at Hahn's trailer home on the evening of July 10 during the drug transaction. Additionally, Pergeson testified that she took the money from the agents and gave it to Begaye and then returned to the agents with the drugs. (Tr. 203:24-204:2.) Moreover, Pergeson testified that following this initial exchange Begaye weighed out the remainder of the methamphetamine on "some digital scales" in Clarence Hahn's trailer. (Tr. 204:14-21; 206:5.)

Similarly important to the government's case is Ogden's testimony regarding the evening of July 11, 2002. Ogden testified that on the evening of July 11, 2002, he and Agent Valles observed "a white, I want to say it was a Grand Marquis, . . . driving up the driveway toward our direction. The vehicle makes the curve and pulls up along the side of us and engages in conversation with myself and Agent Valles. He pulls up on the passenger side of the vehicle, I'm the driver of the vehicle." (Tr. 36:8-14.) Ogden testified that he recognized the driver of this white vehicle from the night before as "the same individual that had given the meth out of his shirt pocket to Ms. Pergeson." (Tr. 36:20-22.) Agent Valles similarly testified that on the evening of July 11, while she was in the passenger seat with Ogden in the driver's seat, a vehicle drove up and stopped "right next to the passenger's side door of the undercover vehicle." (Tr. 87:21-22.) Valles testified that the vehicle was "[c]lose enough where it was, it would be hard for me to open my door on the passenger's side door . . . ." (Tr. 88:1-2.) Valles also testified that the individual in the vehicle was Andrew Begaye, who she subsequently identified in a photograph. (Tr. 888:4-14.)

In addition to the eyewitness accounts of the events of July 10 and 11, the government presented considerable circumstantial evidence linking Pergeson, Hahn, and Begaye. First, the

17

government presented evidence that Begaye's cell phone records showed calls between Begaye and Hahn's and Pergeson's telephone numbers at odd hours of both the day and night. (Tr. 582:5-16.) For example, the government presented evidence of phone calls between Hahn and Begaye at 11:00 p.m. and 2:00 a.m. (Tr. 582:8.) The government also questioned Begaye regarding his telephone bill that indicated phone calls between his cell phone and a cell phone registered to Pergeson. (Tr. 589:11-14.) Second, the government found a scale in Begaye's house that matched Hahn's and Pergeson's description of the scale allegedly used by Begaye to process methamphetamine transactions. (Tr. 129:16-23, 204:21-205:25.) Third, the government presented evidence that Hahn and Pergeson knew that the last four digits of Begaye's cell phone number spelled a word. Although Pergeson could not recall the exact word, Hahn recalled that the last four digits spelled the name "DREW." (Tr. 169:22-23.) Finally, the government presented evidence that the car observed by the DEA agents on July 11 was registered to Begaye. (Tr.39:10-21.)

Such evidence presented by the government provides considerable support for the guilty verdict reached by the jury. Begaye's two proposed alibi witnesses provided nothing that would have weakened the government's case in a manner sufficient to undermine confidence in the jury's verdict. Notably, both Begaye and his wife, in support of Begaye's alibi defense, testified to their dinner with the Dyers at the Pizza Hut on July 10. The jury, therefore, heard Begaye's own testimony regarding his activities on the evening of July 10 as well as his wife's corroborating testimony. *See Foster*, 182 F.3d at 1185 ("This is not a case in which counsel presented no alibi defense. [Defendant] himself testified that at his wife's request he walked from his home to Weddles grocery store, soon after he and his wife got home from shopping together at that same store."). While two more witnesses may have provided additional corroboration, the imprecision of Ron and Teresa Dyer's testimony, coupled

with their lack of knowledge of Begaye's activities following his departure from the Pizza Hut, would not have weakened the government's case in a manner sufficient to conclude that there is a reasonable probability that, but for the omission of the alibi witnesses, the result of the proceeding would have been different. *See Kleba v. McGinnis*, 796 F.2d 947, 957 (7th Cir. 1986) (concluding that failure to call an alibi witness was not prejudicial where the government offered "overwhelming evidence" of the defendant's guilt and where, if the defendant had left the alibi witness's apartment "ten minutes earlier than alleged in the affidavit, he would have had ample time to commit the crimes for which he was convicted"). Thus, Begaye has failed to establish that defense counsel's failure to call additional alibi witnesses prejudiced his defense. Begaye has therefore failed to satisfy the second prong of the *Strickland* analysis.

### *Identification*

Begaye contends that Klipstine should have filed a motion challenging or attempting to suppress Agent Valles's identification of him. He asserts that there were good reasons for challenging the identification because it was based on a single photograph provided to Valles several months after her only encounter with the suspect under poor lighting conditions. As with his alibi argument, Begaye has not shown a reasonable probability that the result of the proceedings would have been different if Klipstine had challenged Valles's identification.

Although Valles was part of the surveillance team on July 10, 2002, she did not identify Begaye as participating in the events that occurred that night. (Tr. 77:7-8.) Because of the darkness and her distance from the transaction, she could not identify the participants. (Tr. 78:9-11; 81:9-15.) On July 11, 2002, she played the role of Agent Ogden's girlfriend. (Tr. 85:13-15.) She testified that while she and Ogden were waiting in the car for Pergeson to return with the methamphetamine, a

19

white Grand Marquis pulled up beside the passenger's side of their car and the driver spoke to them. Valles was sitting on the passenger's side. The Grand Marquis was so close to them that it would have been hard for her to open the passenger's side door of their car. (Tr. 87:19-25; 88:1-3; 88:16-24.) Valles testified that another officer later showed her a photograph of Begaye and she identified him as the driver of the vehicle. She also identified Begaye at trial. (Tr. 88:4-15; 89:4-14.)

Klipstine extensively cross-examined Valles regarding the accuracy of her identification. During the cross-examination, Valles revealed that she never saw Begaye before or after July 11, 2002, that the July 11 encounter only lasted thirty seconds, and that it was so dark she could not tell if the person riding the bicycle was male or female. (Tr. 91:4-16.) She also admitted that it would have been a "good idea" to use more than one photograph to achieve an accurate identification. (Tr. 109-10.)

In addition to Valles, other witnesses implicated Begaye in the July 11, 2002 methamphetamine transaction. Pergeson and Hahn testified about his involvement in the transaction. And like Valles, Agent Ogden identified Begaye as the person driving the Grand Marquis that evening.

Given the cumulative nature of Valles's identification and Klipstine's thorough cross-examination of her on this issue, it is not reasonably probable that the result of the proceeding would have been different if her identification of Begaye had been suppressed.

### Remaining Claims

Begaye makes a host of additional complaints about Klipstine's performance.  He criticizes Klipstine for failing to object to expert testimony or to the government's notice of 404(b) evidence. However, he does not identify any basis for objections, or offer any reason to conclude that the result

of the proceedings might have been different if Klipstine had made these objections. *See United States v. Dixon*, 1 F.3d 1080, 1083 n.5 (10th Cir. 1993) ("Failure to raise an issue that is determined not to have merit does not constitute constitutionally ineffective assistance of counsel."), *abrogated on other grounds by Florida v. White*, 526 U.S. 559 (1999); *Coleman v. Brown*, 802 F.2d 1227, 1234 (10th Cir. 1986) ("[T]he Sixth Amendment does not require that every possible motion be filed, but only those having a solid foundation."). He does not even point to any place in the record where the 404(b) evidence described in the notice was admitted at trial.

Similarly, Begaye does not offer any reason to think that Klipstine's failure to visit the trailer, to file a witness or exhibit list, or to appear for the arraignment might have prejudiced him. He does not identify any witness or exhibit that was excluded because of the failure to file the lists. I also note that the arraignment was continued when Klipstine failed to appear. (Doc. 101, 109.)

Begaye asserted at the evidentiary hearing that Klipstine failed to present certain evidence that he and his wife provided to Klipstine. He testified that "they were seeing a white Lincoln drive by, and we actually didn't have that Lincoln at that time, July 10th or 11th." Counsel then asked, "Not until August?" Begaye responded, "Right. So I had my registrations, license plates, the purchase agreement from the dealership on that vehicle and brought that to court." In fact, this evidence was admitted at trial. Defense Exhibit 11, admitted during the testimony of Begaye's wife, consisted of the original receipts and registration, showing that they purchased a white Lincoln Town Car on August 30, 2002. (Tr. 492:15-493:20.) Moreover, the white car observed on July 11, 2002 was a Mercury Grand Marquis. Begaye admitted during cross-examination at trial that he owned a 1992 Mercury Grand Marquis, but stated either that the car was not at the scene of the offense on July 11

21

or that he did not drive the car that day. He did not deny owning the car on that day. (Tr. 613:4-614:1.) As to this evidence, Begaye has demonstrated neither deficient performance nor prejudice.

Begaye also testified at the evidentiary hearing that he and his wife had documentary evidence (such as receipts and phone bills), showing that he was out of town on "June 2nd, 10th, and . . . the 16th," when drug buys supposedly occurred at his house. Although Begaye did not provide a year for these dates at the evidentiary hearing, he seems to be referring to the June 2003 offenses. The drug buys occurred on June 2, June 10, and June 19. Begaye and his wife testified at trial that they were out of town from June 15 to June 20, 2003. They did not state that they were out of town on June 2 or June 10, 2003. (Tr. 549:18-550:14; 562:18-22.) In any event, Begaye was acquitted of the June 2003 offenses. Therefore, he cannot demonstrate any prejudice in Klipstine's failure to introduce this evidence.

Begaye next contends that he was entitled to instructions on identification and alibi. The identification instruction would have advised the jury to consider specific factors relating to the witness's ability and opportunity to observe the person who committed the offense and relating to the circumstances under which a later identification was made. *See* 10th Cir. Criminal Pattern Jury Instructions § 1.29 (2005). Given the number of people who identified Begaye, including people who knew him before the offenses occurred, and other evidence linking Begaye with the offenses, it is not reasonably likely that the outcome would have been different if this instruction had been given.

The purpose of the alibi instruction is to disabuse the jury of any notion that the defendant bears the burden of establishing that he was not present at the scene of the offense. *See* 10th Cir. Criminal Pattern Jury Instructions § 1.35 cmt. (2005). Because the jury acquitted Begaye of the June 2003 offenses, that concern does not seem to be present in this case. Begaye has not demonstrated

a reasonable probability that the result of the trial would have been different if the alibi instruction had

been given.

**CONCLUSION**

I recommend that Begaye's Motion to Vacate, Set Aside or Correct Sentence under 18

U.S.C. § 2255 be denied.

> **THE PARTIES ARE NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy
> of these Proposed Findings and Recommended Disposition they may file written objections with the
> Clerk of the District Court pursuant to 28 U.S.C. § 636 (b)(1). **A party must file any objections
> with the Clerk of the District Court within the ten-day period if that party wants to have
> appellate review of the Proposed Findings and Recommended Disposition. If no objections are
> filed, no appellate review will be allowed.**

_____
WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE